Exhibit 1

January 2011

# Traffic Report: Online Piracy and Counterfeiting



# Traffic Report: Online Piracy and Counterfeiting

## Contents

Key Findings ............................................................... 4

Methodology .......................................................... 4

Criteria for Websites .................................................... 5

Traffic Analysis ......................................................... 7

Conclusion ............................................................... 8

Case: 1:15-cv-00913 Document #: 1-2 Filed: 02/18/21 Page 4 of 50 PageID #:152
Case: 1:15-cv-07932 Document #: 1-2 Filed: 09/09/15 Page 4 of 11 PageID #:152
Traffic Report: Online Piracy and Counterfeiting

The Internet is arguably one of the greatest innovations of modern society—allowing for countless new businesses to thrive and dramatically altering the way society operates. The Internet has enabled a global marketplace to flourish with lightning-quick communication and an unparalleled access to information. However, the advancement of the Internet into nearly all of our daily activities, combined with rapid download speeds, the perfection of digital copies, the rise of e-commerce and the complexity of online enforcement, has magnified the seriousness and consequences of online counterfeiting and piracy. Websites offering pirated goods generate billions of visits annually, and websites that sell counterfeit luxury goods, fake drugs, and products that may pose health and safety risks attract hundreds of millions annually.

Recognizing that illicit online sales have a significant impact on the U.S. economy in financial terms as well as in public health and well-being, MarkMonitor® worked to identify a sample of rogue Internet sites that are responsible for trafficking counterfeit and pirated goods. The goal of the project was to illustrate the nature of this illicit ecosystem and, using publicly-available traffic information on the number of visits, determine its scope.

The first step was to identify business categories and brands targeted by online counterfeiters and digital pirates. Using 22 major brands as criteria—ranging from pharmaceuticals, luxury goods, and apparel to entertainment titles and software—MarkMonitor used its patented technology to comb the Internet for sites suspected of offering counterfeit goods or pirated digital content. The initial scans resulted in more than 10,000 results which were then de-duplicated and filtered further using MarkMonitor technology to identify dedicated e-commerce and digital download sites. The final step required hand-examination and verification of more than 600 results to determine classification. Since some sites offered multiple brands, this step led to almost 100 unique domains or websites which were then classified in one of two ways: 'counterfeit' or 'digital piracy'.

 Using publicly-available Internet traffic data from Alexa, the sites were then ranked by the number of visits, which were significant, speaking to the level of demand for these goods as well as to the website operators' success in promoting these sites so they are visible and accessible online. Since the study used a sample of only 22 brands, it provides a small glimpse of the nature of online intellectual property (IP) theft and the dark side of illicit e-commerce. However, given the large number of popular brands, it is reasonable to assume that hundreds of thousands of other rights-holders, brands and content creators are suffering the same damage.

> *As our economy has worsened, brand abusers have sharpened their focus.*

Case: 1:21-cv-00913 Document #: 1-1 Filed: 02/18/21 Page 5 of 50 PageID #:153
Case: 1:15-cv-07932 Document #: 1-1 Filed: 09/09/15 Page 5 of 11 PageID #:106

Traffic Report: Online Piracy and Counterfeiting

## Key Findings

The study's findings demonstrate that online distribution of pirated digital content and e-commerce sales of counterfeit goods is rampant. Specific findings include:

- In total, the 10 media brands in the study yielded 43 unique sites classified as 'digital piracy.' Traffic generated to these sites was over 146 million visits per day, representing more than 53 billion visits per year.

- The top-three websites classified as 'digital piracy'—rapidshare.com, megavideo.com, and megaupload.com—collectively generate more than 21 billion visits per year.

- The availability of reliable infrastructure is an important factor in the location of sites hosting piracy. The study found that North America and Western Europe represented the host location for 67 percent of the sites classified as 'digital piracy.'

- The combined traffic to the 48 sites selling counterfeit goods is more than 240,000 visits per day on average or more than 87 million visits per year.

- When it comes to host location of the sites categorized as 'counterfeit', 73 percent were hosted in North America or Western Europe. Eastern European countries hosted another 14 percent of the sites while 9 percent of the sites were hosted in Asia.

- The combined traffic to the 26 sites selling counterfeit prescription drugs is more than 141,000 visits per day on average or more than 51 million visits per year.

- The combined traffic to the 21 e-commerce sites selling counterfeit luxury goods is more than 98,000 visits per day on average or almost 36 million visits per year.

These findings are just the tip of the iceberg. The true scope of the problem is exponentially higher in terms of user traffic, lost revenue and risks to public health and safety.

*"The study used only 22 brands, so we can assume that many other brands and content-creators are suffering similar damage.*"

## Methodology

Using a list of industries most affected by online counterfeiting and digital piracy,[1] MarkMonitor chose major brands from each industry and ran automated scans for those brands using its patented technology. In all, the study examined 22 brands in the digital content category (movies/TV shows, music and software/videogames) and the physical goods category (handbags, sports apparel, pharmaceuticals and luxury items, footwear, and apparel.)

The study used very narrow criteria to classify sites selling physical goods as 'counterfeit.' It is important to point out that many of the e-commerce sites that did not meet that strict guideline did display multiple factors arousing suspicion. This

---

[1]  Digital Content industries: Entertainment (music/movies/television shows), Software/Videogames; Physical Goods: Handbags, Sports Apparel with logos, Pharmaceuticals, luxury items, footwear, and apparel.

Case: 1:21-cv-00918 Document #: 1-2 Filed: 02/18/21 Page 6 of 50 PageID #:154
Case: 1:15-cv-07932 Document #: 5-1 Filed: 09/09/15 Page 6 of 11 PageID #:107
Traffic Report: Online Piracy and Counterfeiting

underscores the crucial role that brand owners and law enforcement personnel trained by brand owners play in determining whether a site is offering counterfeit goods. Technology can be used to conduct the heavy lifting in identifying and prioritizing sites for further action, but the in-depth market and product knowledge of brand owners' is vital.

The scans focused on identifying e-commerce and peer-to-peer, streaming, and torrent sites that yielded high traffic levels. In order to be classified as an e-commerce site, the site needed to contain a shopping cart while the sites classified as piracy needed to contain some type of link, index or player that could be used to download, stream or share digital content. These criteria were designed to eliminate editorial, blog or discussion sites and to focus exclusively on sites where pirated goods could be shared, viewed, streamed or downloaded and counterfeit goods could be purchased.



Site attracts more than 10 million visits per day.

The initial scans resulted in more than 10,000 results which were then de-duplicated and filtered further using MarkMonitor technology to identify dedicated e-commerce and digital content sites used for downloading, sharing or streaming. The final step required hand-examination and verification of more than 600 results to determine classification. Since some sites offered multiple brands, this step led to almost 100 unique domains or websites which were then classified as either 'counterfeit' or 'digital piracy'. The results were ranked by the amount of traffic, defined as the number of daily visits, using Alexa-supplied information. None of the scans contained MarkMonitor customer data or information.

## Criteria for Websites

The results from the initial scans were examined further by MarkMonitor experts in order to classify these sites, or domains, into one of two categories: 'counterfeit' or 'digital piracy.' After thorough analysis, MarkMonitor concluded that 91 websites with high traffic numbers qualified for inclusion in one of these categories. The 'counterfeit' classification referred to e-commerce sites selling counterfeit physical goods while the 'digital piracy' classification refers to sites offering pirated versions of music, movies, television shows, software, and videogames.

**Digital Piracy:** The total number of unique domains identified as 'digital piracy' totaled 43. To fit the 'digital piracy' classification, the domain needed to offer or point to one or more of the brands used in the digital content portion of the study for free. While some of these sites do offer takedown processes for pirated

Case: 1:21-cv-00918 Document #: 1-2 Filed: 02/18/21 Page 7 of 50 PageID #:155
Case: 1:15-cv-07932 Document #: 1-1 Filed: 09/09/15 Page 7 of 11 PageID #:108

Traffic Report: Online Piracy and Counterfeiting

content, the action must be initiated by the content owner. The resulting domains were then sorted by traffic volume.

**'Counterfeit':** In the case of e-commerce domains selling physical goods, the domains needed to satisfy one of two conditions to be deemed as selling counterfeit goods: (1) either the domain itself specified that the goods were not authentic (i.e., using terms like "replica," 'knock-off,' and 'copy') or (2) in the case of pharmaceuticals, the domain offered 'generic' versions of prescription drugs that are not available in generic form in the U.S., targeted the U.S. market by providing pricing in U.S. currency, and did not require a prescription.[2] Since some domains offered more than one type of product, the domain is counted only once, even if multiple URLs for that domain surfaced during the scans. MarkMonitor found that 48 websites fell under the criteria for selling counterfeit goods.

While the online pharmacies displayed the 'generic' label prominently on product listings, MarkMonitor needed to consult FAQ or 'About' sections of the online drugstores, or even needed to follow the purchase process, in order to determine if prescriptions were required by the online pharmacy. In addition, MarkMonitor examined the currency used to quote prices, shipping information or other information on the site that indicated markets served, such as flags, shipping information, telephone numbers or references to the U.S. Drug Enforcement Agency. Many of the e-commerce domains selling counterfeit goods displayed the term 'replica' quite prominently while others included such information in their FAQ or 'About.'



Site sells 'generics' without prescription for prescription drugs that are not available in generic form.



Site explains the difference between 'generic' and branded prescription drugs and highlights unmarked shipping envelopes.

---

[2] During the course of the study, MarkMonitor identified some additional sites that fit the criteria for inclusion but did not use one of the original media brands such as sites offering key generators used to 'unlock' protected material.

## Traffic Analysis

As a backdrop to examining website traffic figures, it is important to point out that traffic measurements can vary greatly depending on methodology. Some traffic measurement sources depend on technology, others depend on some type of user panel or community, and a third category uses a hybrid approach. Each approach has advantages and disadvantages which, as a result, allow publicly-available traffic data to vary based upon the measurement source. In this study, MarkMonitor used data based on Alexa. The more than 90 unique domains culled from the initial set of over 10,000 results display a wide range of traffic figures, depending on the type of goods being offered.

**Digital Piracy Web Traffic Analysis:** Those domains classified as 'digital piracy' attracted the highest levels of traffic with a high in excess of 32 million daily visits on average for the most-trafficked domain—rapidshare.com. On an annual basis, that traffic equates to more than 11.8 billion visits per year for that site. This pattern continues with the second and third most-trafficked sites—megavideo.com and megaupload.com—each of which generates more than 13 million visits per day on average, or more than 4.9 billion visits per year to each site. Collectively, these three digital piracy sites generate more than 21 billion visits per year.

In total, traffic generated to the sites classified as 'digital piracy' was more than 146 million visits per day, representing more than 53 billion visits per year. Lest these figures be viewed as anomalies, examining the ten least-visited 'digital piracy' sites show annual visits total more than 781 million per year, demonstrating that even the lesser-trafficked sites in this category drive significant traffic.

The bulk of the 'digital piracy' sites, or 67 percent, were hosted in North America or Western Europe.

**Counterfeit Website Traffic Analysis:** Due to the narrow criteria used to classify sites as 'counterfeit,' all the sites included in the analysis, with one exception, sold prescription drugs or luxury goods, including handbags, watches or jewelry. The combined traffic to the 48 sites selling counterfeit goods is more than 240,000 visits per day on average or more than 87 million visits per year. The majority of these sites reflect similar patterns as the sites classified as 'digital piracy' when it comes to the server's host location with or 56 percent hosted in North America and Western Europe. However, Eastern European countries hosted 22 percent of the sites while 14 percent of the sites were hosted in Asia.

> *Traffic to sites suspected of offering pirated content was over 146 million visits per day.*



Site attracts more than seven million visits per day.

However, examining the site registration information for these 'counterfeit' sites suggests that more of these sites may be linked to Asia as seven sites hosted in non-Asian countries are actually registered by Asian registrars. Factoring in that information indicates that 29 percent of the sites have some connection to Asia, either through host location or registrar.

While not at the scale of the suspected digital piracy sites, e-commerce domains classified as 'counterfeit' attracted considerable levels of traffic as well with the most-trafficked site, an Internet pharmacy, driving 28,000 daily visits on average, representing more than 10 million visits to the site per year.

> *Combined traffic to the sites selling counterfeit goods is more than 87 million visits per year.*

**Suspicious Sites:** During the course of the research, we identified sites that displayed one or more factors that appeared questionable, such as significant price discounts, links to sites selling counterfeit goods, trade dress issues, or, in the case of online pharmacies, no requirement for prescriptions. These types of issues underscore the crucial role that brand owners and law enforcement personnel trained by brand owners play in determining whether a site is offering counterfeit or pirated goods. While some sites are very clear in specifying their goods are 'copies' or 'replicas,' others are less forthcoming. In many cases, deep discounts combined with promises of high-quality goods from the current season raise questions that only the brand owner—with knowledge of channel strategy, pricing and partnerships—can address.

In the case of highly regulated goods like pharmaceuticals, intellectual property protections for pharmaceutical patents or regulations governing generics may differ across national boundaries. Instead, the business practices of the pharmacy itself—such as prescription requirements or sales of individual pills—are more useful in identifying suspicious drugs. The role of the brand owner, with in-depth knowledge of distribution channels, pricing and local business practices, is vital. In each of these examples, the most authoritative answer is provided by a physical examination of the goods themselves.



This site promotes replica designer bags and attracts more than two million visits annually.

## Conclusion

The research presented in this study demonstrates the wide availability of pirated digital content and counterfeit goods via the Internet and e-commerce. The websites yielded in the research and analyses of this study all have one thing in common: business models that are indisputably centered on the sale or distribution of counterfeit and pirated goods. These illegal operations are shifting revenue

Case: 1:21-cv-00913 Document #: 11-2 Filed: 02/18/21 Page 10 of 50 PageID #:158
Case: 1:15-cv-07932 Document #: 9-1 Filed: 09/09/15 Page 10 of 51 PageID #:158

Traffic Report: Online Piracy and Counterfeiting

from legitimate brands' e-commerce sites, causing economic harm and risking consumer health. This study highlights the type of data that needs to be examined in order to identify and locate sites trafficking in counterfeit and pirated goods. Accurate and unbiased information describing the scope of online counterfeiting and piracy as an essential prerequisite for safeguarding consumer safety and economic well-being.

While counterfeiting and piracy in the physical world are serious problems, these issues are growing at a significant rate online and pose unique challenges in remediation, due to the inherent nature of the Internet with its global reach, cost efficiencies, and anonymity. Awareness and educational efforts focused on the distinctive nature of online counterfeiting and piracy are necessary in developing effective response mechanisms to this global, cross-border problem. Necessary government policies, corrective legislative measures, law enforcement action and, most importantly, actively-engaged brand owners are all needed to stem this growing tide of illegal Internet activity. The bottom line is that online IP theft ultimately affects the most creative and innovative sectors of the economy, contributing to billions in lost revenue and millions of lost jobs. Protecting IP rights is a critical component of our economic resurgence, and vitally important to our future; stopping the spread of pirated and counterfeit goods is a necessity.

> *Combined traffic to the pharmacies selling suspected counterfeit prescription drugs is more than 51 million visits per year.*

Case: 1:21-cv-00918 Document #: 11-2 Filed: 02/18/21 Page 11 of 50 PageID #:159
Case: 1:15-cv-07932 Document #: 9-1 Filed: 09/09/15 Page 11 of 11 PageID #:152

Traffic Report: Online Piracy and Counterfeiting

## About MarkMonitor

MarkMonitor, the global leader in enterprise brand protection, offers comprehensive solutions and services that safeguard brands, reputation and revenue from online risks. With end-to-end solutions that address the growing threats of online fraud, brand abuse and unauthorized channels, MarkMonitor enables a secure Internet for businesses and their customers. The company's exclusive access to data combined with its patented real-time prevention, detection and response capabilities provide wide-ranging protection to the ever-changing online risks faced by brands today. For more information, visit **www.markmonitor.com**

More than half the Fortune 100 trust MarkMonitor to protect their brands online. **See what we can do for you.**

MarkMonitor, Inc.
U.S.        (800) 745.9229
Europe    +44 (0) 207.840.1300
**www.markmonitor.com**

Boise  |  San Francisco  |  Washington D.C.  |  London



© 2011 MarkMonitor Inc. All rights reserved. MarkMonitor® is a registered trademark of MarkMonitor Inc. All other trademarks included herein are the property of their respective owners. Source Code: TROCPWP101208

White Paper

# Seven Best Practices for Fighting Counterfeit Sales Online

## Executive Summary

Counterfeit sales represent 5 to 7 percent of world merchandise trade today[1]. The damage these sales do to rightful brand owners goes well beyond revenues and profits: numerous reports have suggested that counterfeit and piracy trade supports terrorism, organized crime and other threats to both national security and human rights. Now, the Internet's rapid growth—along with its instant global reach and anonymity—has significantly escalated the situation.

An entire online supply chain, parallel to legitimate distribution channels, has flourished around counterfeit goods. Online B2B exchanges, in addition to eCommerce sites—many promoted via social media and search engines—commonly traffic in counterfeit goods. Fake products acquired on wholesale sites are sold on auction sites, or at flea markets and shops in the physical world.

Deceptive use of proven marketing techniques—paid search ads, search engine optimization, unsolicited email, the use of branded terms in domain names and more—are important parts of this illicit ecosystem, as savvy counterfeiters apply marketing best practices.

Fortunately, brand owners can adopt their own proven best practices to successfully combat online counterfeit sales. Technology exists for identifying and quantifying worldwide online counterfeiting activity—in both promotion and distribution—as it affects a specific brand. Once visible, infringement can be prioritized and attacked. Unlike anti-counterfeiting strategies in the physical world, however, a two-pronged approach is necessary: brand owners must choke off counterfeit sales at both promotional and distribution points.

The battle against online counterfeit sales can be won. With billions in revenues, critical customer loyalty, and even public safety and human rights at stake, it must.



## Contents

Counterfeiting: A Growing Online Threat ..................................... 3

Counterfeiting's Real Cost to Business .................................. 3

How Counterfeiting Thrives Online ............................... 4

Beating Back Counterfeiters Online: Seven Best Practices ...... 5

Conclusion: The Fight Is Yours to Win ........................................ 9

## Counterfeiting: A Growing Online Threat

"If you can make it, you can fake it." Unfortunately, the old saying is all too true. Sales of counterfeit goods affect a wide range of industries, from high-margin luxury and technology goods to low-margin consumer goods like batteries, shampoo, gasoline and food.

The problem is growing, in part because the volume of fake goods produced is rapidly increasing—especially in countries like China, where manufacturing capacities continue to skyrocket (89 percent of seized counterfeit products originate there).[2]

This growth in supply helps fuel the exploding demand—especially online. The Internet's rapid growth—along with its instant global reach and anonymity—has significantly escalated the situation, moving the sale of counterfeit goods from the local street corner to a global marketplace. Because criminals can quickly and easily set up eCommerce storefronts or place listings on B2B exchanges and on auction sites—with only minor expense—their activities will likely cost legitimate businesses $135 billion in lost revenue this year.

## Counterfeiting's Real Cost to Business

According to the secretary general of the ICC, multinational manufacturers lose roughly ten percent of their top-line revenue to counterfeiters[3] —but the impacts go well beyond the revenue hit. For some companies, perceived brand value suffers when knock-offs become plentiful. Brands may even lose representation in distribution channels when resellers and affiliates see a reduction in demand due to competition from fakes. Additionally, the availability of cheaper, albeit fake alternatives can exert downward pressure on legitimate brand pricing.

Other impacts include product safety issues—especially in pharmaceutical, automotive, aviation, healthcare electronics and similar industries—accompanied by increased legal liability risks. And as consumers experience quality problems with fake goods, the legitimate brand's customer service and warranty costs can climb.

Marketing costs also rise as illicit sellers bid up paid search advertising costs and erode legitimate search engine optimization (SEO) investments. Finally, as more customers encounter inauthentic brand experiences, both loyalty and lifetime customer value suffer.

---

[1]  International Chamber of Commerce

[2]  *Intellectual Property Rights Seizure Statistics: Fiscal Year 2009*, U.S. Customs & Border Protection, Oct 2009

[3]  http://www.livemint.com/2007/06/18001520/Counterfeiters-taking-on-globa.html

# How Counterfeiting Thrives Online

## Burned by counterfeiters: Zippo Lighters[4]

**Revenues:**　Zippo lost fully one third of its revenues to counterfeiters between 1995 and 2001.

**Employment:**　For every 20,000 fake lighters sold, Zippo reduced staff by 1 full-time employee.

**Product Safety:**　Lower-quality, counterfeit lighters, with a greater tendency to flare up or even explode, caused serious consumer injury.

**Liability:**　Zippo was named in two lawsuits for incidents involving "Zippo lighters" it had not manufactured.

An entire online supply chain—parallel to legitimate distribution channels—has grown around counterfeit goods. This illicit but highly profitable industry takes advantage of the same online tools, techniques and best practices employed by legitimate brands online.

The contrasts with counterfeiting in the physical world are important to understand, and are founded on the Internet's global reach, anonymity, and efficiency. These attributes—and especially the online world's powerful promotional potential—have enabled online counterfeiters to dramatically (and rapidly) outstrip all the street corner fakes, flea markets and "canal street districts" that exist.

In the wholesale trade, B2B exchanges (also known as trade boards) commonly traffic in counterfeit goods. At the retail level, auction sites and eCommerce sites supply counterfeit goods to consumers. It's not unusual for individuals to acquire fake goods on wholesale sites, only to resell them to consumers on auction sites and in other online, consumer-facing venues—in addition to offline flea markets, bazaars, and even retail shops.

Promotion is an important part of this illicit ecosystem. Counterfeiters use the same tactics as legitimate marketers, such as paid search ads and search engine optimization to lure buyers to their sites. According to *Direct Magazine*, fully 14 percent of searches on a branded item lead online users somewhere other than the legitimate brand's site: While some of these searches may lead to legitimate resellers or partners, it's reasonable to assume that many of them end up on the site of a counterfeiter.

Some counterfeit sellers also employ unsolicited email—spam—to boost their site traffic. This is especially prevalent among sellers of fake pharmaceuticals, software, and luxury goods such as watches, jewelry, and high-end apparel. They also make use of cybersquatting techniques, using branded terms in domain names in order to attract web traffic and convey authenticity. And, as savvy marketers, they take advantage of inbound linking strategies and other search engine optimization (SEO) techniques to sell their illicit goods online.

---

[4]  http://www.zippo.com/NewsAndEvents/Counterfeiting_of_Zippo_lighters_in_China_affecting_Bradford. aspx?article=9209ee4c-ff1e-4712-b340-7f24bf485164&bhcp=1

The counterfeiting ecosystem extends to popular auction and exchange sites, of course, where direct searches frequently include counterfeit goods among their results. Links to sites pushing counterfeit wares can also be found in quantity on social media venues such as social networking sites, blogs and micro-blogs.

Clearly, legitimate and counterfeit ecosystems overlap—with some auction and eCommerce sites selling both real and fake goods—and this makes the problem more difficult to address. There are best practices, however, which can help brands minimize the damage from online counterfeit sales.

## Beating Back Counterfeiters Online: Seven Best Practices

While the sale of counterfeit goods in the physical world is a timeworn tradition—if an unwelcome one—the online counterfeiting ecosystem offers unique challenges that require a unique online approach. Proven best practices have emerged from brands that have actively and successfully engaged in combating counterfeit sales online.

**1. Attain global visibility**. Before a brand can understand the scope of the threat posed by online counterfeit sales, it must expose and quantify the problem. As we have seen, counterfeiters operate over a wide array of online channels; all of these, including B2B exchanges, auction sites, eCommerce sites, message boards, and the rest, must be monitored and analyzed. There's some good news: just ten online marketplaces account for fully 80 percent of all marketplace traffic. Monitor these marketplaces, and you're watching a significant share of traffic.

The counterfeit sales volumes involved cited here—along with everything else about the Internet—are all enabled by technology. The only possible way to approach the monitoring challenge is to leverage technology as well; there is simply no other practical method.

**2. Monitor points of promotion.** While it's obviously important to identify and shut down distribution channels, it's almost certain that counterfeiters will regularly seek new sales venues. So it's just as critical to monitor the online promotional activities these criminals launch.

Counterfeiters use the same effective promotion techniques employed by legitimate marketers—leveraging the powerful, highly recognizable brands built by experts. Using paid search advertising, links within social media, black hat SEO tactics, cybersquatting and spam, they successfully steer traffic to their illicit offerings, while diminishing the marketing ROI of legitimate brand holders.

Monitoring for these promotional efforts is critical—and enables our next best practice.

### The best tools for fighting technology-enabled counterfeit sales.

**Brand:** Snap-on Tools

**Challenge:** Significant online sales of counterfeit Snap-on tools, resulted in erosion of revenues, perceived brand value, and customer loyalty.

**Response:** Snap-on employed sophisticated monitoring and detection technology solutions to fight online counterfeit sales.

**Results:** Counterfeit products valued at $1.2 million—found in 4,900 illegal auction listings—were identified and removed in coordination with an online auction site.

**3. Take proactive action.** Counterfeiters obviously encounter more success when left to operate unchallenged; they're also known to shift their energies to more passive targets when brands visibly fight back. Once a brand understands where the greatest threats lie, aggressive action is the best strategy. Brands should:

- **Set priorities.** The biggest offenders, offering the greatest number of counterfeit goods in the most highly trafficked venues, should be identified and addressed first. Brand owners should determine which counterfeit goods are generating the largest sales, and target them first as well.

- **Watch for cybersquatters.** Brands should actively monitor cyberspace for unauthorized use of their branded terms in domain names. This will aid in rapid detection of eCommerce sites selling counterfeit or unauthorized goods—and frequently also uncovers other abuses such as false association with offensive content like pornography.

- **Become a difficult target.** Brands that visibly, vigorously fight to remove counterfeit goods from online venues often see a dramatic drop in infringement against their brands.

- **Use all your weapons.** Most online channels provide mechanisms for dealing with counterfeit sales situations. Online marketplaces, for example, typically have policies and procedures enabling brand owners to report listings that infringe their brand. Others often respond readily to emailed complaints from brand owners.

Search engines offer similar facilities. Major search engines have procedures for requesting the removal of ads linked to counterfeit sites. Websites can also be removed from search results pages if they are found to violate copyright laws (a common practice among counterfeit sites, typically through unauthorized use of product images).

Another useful tactic is the sending of takedown notices, which can be sent directly to Internet service providers. In one recent court case[5], two web-hosting companies were fined $32 million for not responding to takedown notices aimed at blocking counterfeit sales on sites they hosted.

- **Get help from friends.** Industry relationships can be powerful weapons in the fight against online counterfeiting. When choosing a brand protection solution provider, look for one with established ties with thousands of ISPs

---

[5] Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc. et al. ; http://www.ft.com/cms/s/0/54c5a3a4-9686-11de-84d1-00144feabdc0.html?catid=57&SID=google&nclick_check=1

and registrars worldwide. Simply put, these ties make it possible to get counterfeit sites shut down more quickly—and thereby minimize brand owner losses. Trade associations such as the International AntiCounterfeiting Coalition (IACC), the Anti-Counterfeiting Group (ACG) and the American Apparel and Footwear Association (AAFA) also provide resources and advice on best practices for fighting counterfeiters.

**4. Fight online counterfeit sales holistically.** Online counterfeit sales are easier to address when the entire enterprise participates. That means brand owners should set up a cross-functional task force to address the issue in a coordinated, holistic manner.

Stakeholders—and, therefore, recommended participants—will vary by industry and enterprise, but can include legal, marketing, risk management, loss prevention, channel sales management, manufacturing, supply chain management, and other functional units.

Because fighting online counterfeiting requires attacking both promotional mechanisms and distribution channels, this group will be larger than needed to fight physical-world counterfeiting. All of these groups can and should set priorities and strategy for detecting, reporting and responding to infringers—both online and off— and should continue to inform the process as their situations and perceptions dictate.

**5. Let online intelligence inform offline defense measures.** Because offline measures—physical investigations, factory raids and other activities—can be costly and time-consuming, it's critical to know where they should be focused. Online intelligence can help identify the most egregious infringers, so that offline defensive efforts can be focused where they'll be most effective.

**6. Act swiftly—and globally.** Perhaps even more than it affects legitimate business, the proliferation of international trade offers tremendous benefits to online counterfeiters. While a domestic seller or manufacturer may seem like an easy first target, brands have learned that it's more effective to launch global anti-counterfeiting initiatives—and to get them underway expeditiously.

### Footwear manufacturer stomps online counterfeiters.

Global footwear leader Deckers Outdoor, faced with millions in online sales of counterfeit and grey market goods, moved promptly to protect its customers and its bottom line. Leveraging brand protection technology, the company was able to:

- Pinpoint—and remove or de-list—$4.35 million in illegitimate goods and knock-offs, all within just 90 days
- Significantly curtail counterfeiting activity that undermined its revenues
- Enhance its brand reputation and increase customer trust and loyalty by automating and extending online enforcement

### Online intelligence helps focus physical efforts.

Acushnet Company, a leader in the golf industry, leveraged online intelligence to guide a major raid in the UK, shutting down a large counterfeiting operation that fed online distribution channels.[6]

---

[6] CNN: http://edition.cnn.com/2009/SPORT/09/23/golf.ebay.clubs.scam

Prepare by ensuring your trademarks are registered internationally—especially in China, which observes a "first-to-file" policy that grants registration to whoever files first, even if it's not the true brand owner.

## Global imaging giant protects its image—and profits.

Print technology leader Epson created a centralized mechanism for globally monitoring for online brand abuses including counterfeit sales.

By forming a global, cross-functional team, Epson achieved a three-fold reduction in counterfeit sales activities on consumer auction and B2B exchange sites. Their visible, aggressive strategy has also served to deter abuse.

## Tall order: fighting counterfeiting in China.

One of the most important centers of counterfeit trade is China. In addition to originating roughly 89% of counterfeit manufactured goods, China hosts vast internal marketplaces—both online and off—where counterfeit goods are traded.

A global effort doesn't preclude addressing markets that are internal to a given country. In some cases, this will require competent language translation resources for monitoring, detection and enforcement. Most companies rely on third-party brand protection solution providers for this kind of expertise.

Many online B2B exchanges and auctions are presented only in Chinese-language characters, posing translation barriers to legitimate brands aiming to protect their rights. Regardless of the source of counterfeit goods sold on these sites, buyers commonly re-sell the illicit products in other online and offline venues. Losses to legitimate brands are in the billions.

**7. Educate your customers.** Your customers can be an important ally in minimizing sales of counterfeit goods with all its associated costs. Work aggressively to show customers the risks of buying from unauthorized sources, and recruit them to join in the effort by reporting suspicious goods and sellers.

Many brands have established web-based tools for verifying the authenticity of goods and/or the legitimacy of sellers. Others provide form- or email-based mechanisms for reporting suspected infringement. When offering such tools, be sure to reinforce the benefits of buying authentic goods from authorized sellers.

Another effective, pro-active measure enables brands to warn consumers directly of known counterfeiting activity, before the consumer makes a purchase. This patented technology leverages relationships with major Internet security providers to deliver early warnings to Internet users, waving them off before they click through to a site known to traffic in counterfeit or recalled goods.

Many consumers don't want cheap knock-offs—and they don't want their authentic goods cheapened by the presence of illicit goods. Take advantage of these sentiments: join forces with your customers to spot counterfeit products quickly and help get them off the market.

## Conclusion: The Fight Is Yours to Win

Online counterfeiting can heavily impact any company, affecting revenues, channel relationships, customer experience, marketing effectiveness, legal liability and more. Ignoring it—or just hoping for the best—simply isn't good business.

Fortunately, taking action can be fairly straightforward. Implementing the best practices discussed here doesn't have to involve complex organizational changes or extensive hiring efforts, as third-party solution providers can help make the effort efficient and supplement internal teams.

To successfully reduce the negative effects of counterfeiting, however, companies must commit to forming a cross-functional team, at least at the advisory level, and to an aggressive, global anti-counterfeiting initiative.

Most importantly: to effectively choke off counterfeit sales, these teams must ensure a strategy that focuses on both distribution and promotional mechanisms associated with counterfeit goods. The returns—in revenues, profits, and long-term brand value—will certainly make the effort worthwhile.

## About MarkMonitor

As the global leader in online brand protection, MarkMonitor provides advanced technology and expertise that protects the revenues and reputations of the world's leading brands. In the digital world, brands face new risks due to the web's anonymity, global reach and shifting consumption patterns for digital content, goods and services. Customers choose MarkMonitor for its unique combination of industry-leading expertise, advanced technology and extensive industry relationships to preserve their marketing investments, revenues and customer trust.

To learn more about MarkMonitor, our solutions and services, please visit **markmonitor.com** or call us at **1-800-745-9229**.

More than half the Fortune 100 trust MarkMonitor to protect their brands online. **See what we can do for you.**

MarkMonitor, Inc.
U.S.          (800) 745.9229
Europe      +44 (0) 203.206.2220
**www.markmonitor.com**

Boise  |  San Francisco  |  Washington, D.C.  |  London

© 2012 MarkMonitor Inc. All rights reserved. MarkMonitor® is a registered trademark of MarkMonitor Inc. All other trademarks included herein are the property of their respective owners. Source Code: WPFC120423



Exhibit 2



# Intellectual Property Rights

## Fiscal Year 2012 Seizure Statistics

Prepared by U.S. Customs and Border Protection
Office of International Trade



Homeland
Security

# Executive Summary

In Fiscal Year (FY) 2012, DHS and its agencies, CBP and ICE, remained vigilant in their commitment to protect American consumers from intellectual property theft as well as enforce the rights of intellectual property rights holders by expanding their efforts to seize infringing goods, leading to 691 arrests, 423 indictments and 334 prosecutions. Counterfeit and pirated goods pose a serious threat to America's economic vitality, the health and safety of American consumers, and our critical infrastructure and national security. Through coordinated efforts to interdict infringing merchandise, including joint operations, DHS enforced intellectual property rights while facilitating the secure flow of legitimate trade and travel.

In recent years, the internet has fueled explosive growth in the numbers of small packages of counterfeit and pirated goods shipped through express carriers and mail. In FY 2012, we heightened our efforts against the sources of these small shipments: the websites involved in the trafficking of counterfeit and pirated goods.  In FY 2012, 697 such sites were taken down by ICE, with CBP handling the forfeitures. The number of IPR seizures remained somewhat consistent from 24,792 in FY 2011 to 22,848 in FY 2012.  We believe the strategy of pursuing the sources of counterfeit goods will provide long-term results in decreasing the flow of counterfeit merchandise into commerce.

The MSRP of seized goods increased from $1.11 billion in FY 2011 to $1.26 billion in FY 2012, with an average seizure value of more than $10,450. At the same time, CBP and ICE made valuable advances to enhance their ability to combat IP theft in the future, including:

2

Exhibit 3





# Estimating the global economic and social impacts of counterfeiting and piracy

<span style="color:red">A REPORT COMMISSIONED BY BUSINESS ACTION TO STOP COUNTERFEITING AND PIRACY (BASCAP)</span>

February 2011

© Frontier Economics Ltd, London.

# Executive Summary

Counterfeiting and piracy has increased substantially over the last two decades. Today, counterfeit and pirated products can be found in almost every country in the world and in virtually all sectors of the global economy. As policymakers grapple with allocating resources across multiple public policy challenges, better information on the full scope, scale, costs and impacts of counterfeiting and piracy is necessary to ensure that the appropriate resources and prioritization are given to combating counterfeiting and piracy.

Estimates of the level of counterfeiting vary but all estimates agree that counterfeiting represents a multi-billion dollar underground economy with hundreds of billions of dollars of counterfeit product being produced every year.

## Building on the OECD's work

Most recently, the OECD endeavoured to address the lack of in-depth systematic evidence on counterfeiting and piracy and provide governments with a reliable, data-based assessment.

The OECD published an extensive report on the subject in 2008[1], and concluded that the value of counterfeited and pirated goods moving through international trade alone equalled $200 billion annually, a number they updated in 2009 to $250 billion[2].

In releasing their findings, the OECD stated,

*"This total does not include the value of domestically produced and consumed counterfeit and pirated products and the significant volume of pirated digital products being distributed via the Internet. If these items were added, the total magnitude of counterfeiting and piracy worldwide could well be several hundred billion dollars more."*

In addition the OECD explained that,

*Counterfeiting and piracy "can have broader economy-wide effects on trade, foreign investment, employment, innovation, criminality, environment [...] and with respect to governments, counterfeiting and piracy have direct effects on tax revenues and government expenditures."*

Taken together, the OECD report delineated four categories of impact, of which they provided quantitative estimates for only one: Counterfeit and pirated goods moving through international trade.

---

[1]     OECD, The Economic Impact of Counterfeiting and Piracy, 2008 (hereinafter "OECD Report").

[2]     OECD, Magnitude of Counterfeiting and Piracy of tangible products: An Update, November 2009.

This study seeks to build on the OECD's work, by updating their estimates and more importantly, introducing and examining categories of impacts identified and discussed but not quantified by the OECD report – the value of domestically produced and consumed counterfeit products, the value of digital piracy, and impacts on society, governments and consumers.

- **Category 1: Counterfeit and pirated goods moving through international trade.** We update the OECD's estimate of the value of counterfeit and pirated goods moving through international trade, drawing on new customs seizure data indicating that the incidence of counterfeiting and piracy has increased relative to the 2005-based customs data used in the OECD's 2008 study.

- **Category 2: Value of domestically produced and consumed counterfeit and pirated products.** We develop a methodology, derived from the OECD's modeling work, to generate an estimate of the value of domestic manufacture and consumption of counterfeit and pirate products – thereby capturing an estimated value of fake products that do not cross borders.

- **Category 3: Volume of pirated digital products being distributed via the Internet.** We describe, evaluate and contextualize industry reports and academic studies on the value of digital piracy of recorded music, movies and software. We then use these studies to produce an estimate of the total value of digital piracy that has been calculated using consistent assumptions and methodology across these industries.

- **Category 4: Broader economy-wide effects.** We provide a summary of previous analysis aimed at identifying the broader economy-wide effects of counterfeiting and piracy.

Before discussing our findings, it is important to be clear about the nature and context of the analysis presented in this report. Since counterfeiting operates outside the law, estimating the exact level of counterfeiting and the harm it brings is extremely challenging. The activities of illegal businesses cannot be measured using the same techniques used for legitimate business concerns.

We have therefore used a variety of analytical approaches to reach our estimates, drawing on a range of sources of information and making conservative assumptions. Our methodologies are described in detail, and we are explicit about the assumptions that have been required to reach the estimates we present and their limitations. While the methods used cannot yield precise estimates, the results do offer compelling evidence of the broad global magnitude of counterfeiting and piracy.

Executive Summary

# Key findings

The following Table 1 compiles the set of findings we refer to as *the complete picture*, drawing together estimates for the total value of counterfeit and pirated products in 2008, along with projections for 2015.  Notably, our estimates of impacts on the broader economy only include estimated impacts on the twenty G20 economies and are presently limited to 2008.

**Table 1. The Complete Picture.** Estimate of the total value of counterfeit and pirated products in 2008 and 2015, and impacts on the broader economy and employment

| OECD Category | Estimate in $ billions (2008) | Estimate in $ billions (2015) |
|---|---|---|
| Internationally traded counterfeit and pirated products | $285 - $360 | $770 - $960 |
| Domestically produced and consumed counterfeit and pirated products | $140 - $215 | $370 - $570 |
| Digitally pirated products | $30 - $75 | $80 - $240 |
| *sub total* | **$455 - $650** | **$1,220 - $1,770** |
| Broader economy wide effects[†]* | $125 | *$125 +* |
| Employment losses* | 2.5 million | *2.5 million +* |

Source: Frontier Economics

[†] Effects on government tax revenues, welfare spending, costs of crime health services, FDI flows

* Estimate limited to G20 economies

## Global economic value

We estimate that, based on 2008 data, the total global economic value of counterfeit and pirated products is as much as $650 billion every year.  Table 2 below provides a breakdown of our estimate.  It shows that international trade accounts for more than half of counterfeiting and piracy (our updated estimate is $285 billion to $360 billion), domestic production and consumption accounts for between $140 billion and $215 billion and digitally pirated music, movies and software accounts for between $30 billion and $75 billion.

Executive Summary

**Table 2.** Estimate of the total value of counterfeit and pirated products (2008)

| OECD Category | Estimate (2008 data) |
|---|---|
| Internationally traded counterfeit and pirated products | $285 billion - $360 billion |
| Domestically produced and consumed counterfeit and pirated products | $140 billion - $215 billion |
| Digitally pirated products | $30 billion - $75 billion |
| **Total** | **$455 billion - $650 billion** |

Source: Frontier Economics

It is important to note that these estimates are likely to provide a conservative estimate of the impact of counterfeiting and piracy. The estimates of the value of counterfeiting are based on 2008 data (the last year for which complete data was available), and given the rapid increase in counterfeiting and piracy observed between 2005 and 2008, this is likely to under-estimate the level of counterfeiting and piracy beyond 2008. It is for this reason that we have provided estimates to 2015.

It is also important to note that this study, following in the footsteps of the OECD report, has not attempted to estimate business losses associated with counterfeiting and piracy. This is primarily because the likely variations and other difficulties associated with estimating substitution effects across substantially different countries and industries introduces an additional level/degree of variables which could undermine our aim to as accurately as possible characterize the magnitude of counterfeiting and piracy.

## Broader economy-wide effects

In addition to their work on economic impacts, the OECD examined – but did not provide quantitative estimates for a range of broader economy-wide effects:

*"Counterfeiting and piracy can have broad economy-wide effects on trade, foreign investment, employment, innovation, criminality and the environment. Concerning the microeconomic effects, the sales volume, prices and costs of rights holders are impacted, as are investment, royalties and brand value. For consumers, counterfeit and pirated products may offer cheap alternatives to genuine goods but are usually of inferior quality. For certain types of infringing goods, the health and safety of consumers may be put at significant risk. With respect to governments, counterfeiting and piracy have effects on tax revenues, government expenditures, and, when corruption takes place, the effectiveness of public institutions. (p. 133)*

## Executive Summary

These social costs are far from insignificant and merit treatment sufficient to ensure that they are not overlooked when considering the full range of negative impacts resulting from counterfeiting and piracy.  In an associated study[3] (excerpted in Chapter 3 of this report), Frontier explored the value and impact of these broader economy-wide effects.  Notably, this work did not capture all of the thirteen "broader economy wide effect" cost-categories identified by the OECD; we only tackled impact of counterfeiting and piracy on government tax revenues, legitimate employment, increased costs of crime, economic costs on consumer health and safety, and downward pressures on FDI flows.  Moreover, the scope of this report was limited to only the 20 countries comprising the "group of 20", and so will be an under-estimate of the global impact of counterfeiting and piracy.  The findings, however, are relevant to this report and serve to complete the picture of the total impacts to "economy and society".

We found counterfeiting and piracy are estimated to cost G20 governments and consumers over $125 billion every year:

- ▢ of this, the G20 economies lose approximately $77.5 billion in tax revenues and higher welfare spending, $25 billion in increased costs of crime, $18.1 billion in the economic cost of deaths resulting from counterfeiting and another $125 million for the additional cost of health services to treat injuries caused by dangerous fake products; and

- ▢ a number of G20 economies may be missing out on higher FDI as a result of concerns over IPR enforcement.  That lost investment could give rise to additional tax losses of more than $6.25 billion across the G20.

### Employment

This report has not considered explicitly the impact of counterfeiting and piracy on employment.  However, Frontier's previous study, which focused on the wider social and economic impacts of counterfeiting and piracy found that counterfeiting and piracy has significant negative impacts on employment across the G20 economies.  Our previous analysis found that **approximately 2.5 million jobs have been destroyed by counterfeiting and piracy** – alternatively, if counterfeiting and piracy could be eradicated or seriously reduced, up to 2.5 million jobs could be created in the legitimate economies of the G20.  It should also be noted that these estimates do not include secondary impacts on employment that may well be experienced by suppliers, retailers and other sectors in the supply chain.

---

[3] Frontier Economics, The Impact of Counterfeiting on Governments and Consumers, December 2009

While it is likely that many of those who lost their jobs have gone on to find reemployment, the personal and family trauma associated with even temporary unemployment should not be lightly discounted. For example, people may quickly get into arrears on mortgages or personal debts, have difficulty paying medical expenses (as benefits are often linked to employment) or be forced to relocate to find alternative employment.

Finally, it is important to note that our previous analysis focused only on the G20 economies and so are likely to under-estimate the negative global impacts of counterfeiting and piracy on employment.

## A growing problem – projections to 2015

Based on the OECD's analysis, our work to update the OECD figures and a range of analysis by industry and academics, it would appear that the value and volume of counterfeiting and digital piracy is increasing rapidly. In order to understand the potential impact of this rapid increase, we have developed an estimate of the value of counterfeiting and piracy in 2015. Obviously, estimating what will happen to counterfeiting and piracy is a difficult exercise, and depends on many factors, including developments in the world economy, and action by business and governments to try to counter such activities. Nevertheless, it is helpful to understand what the total magnitude of counterfeiting and piracy would be in 2015, were current growth rates to continue.

The OECD's original report (based on 2005 data) estimates that the value of counterfeit and pirated products in trade equated to $200 billion. In 2009, the OECD increased this figure to $250 billion. Updating these trends using 2008 data to reflect increases in trade *and* seizures since 2005, we find that the value of counterfeit and pirated products in trade has increased by up to $160 billion (to $360 billion) over this period – this is an increase of around 22% per year. Were counterfeiting and piracy to continue to grow at even the much lower rate of 15% per year, it would imply that traded counterfeit and pirated products could be worth up to **$960 billion by 2015.** Similar increases for domestic counterfeit production and consumption imply estimates of up to **$570 billion by 2015**.

The findings also suggest that digital piracy has grown substantially over the last decade, to the point where it now accounts for between 6.5% and 12% of the total value of counterfeit and pirated products consumed. In some sectors, such as music, movies and software, digital piracy accounts for a substantially greater share of the total. It is also likely that digital piracy will continue to grow rapidly over the next decade as internet access grows and ever-faster broadband speeds facilitate illegal downloads and file sharing. Even using a highly conservative assumption, that digital piracy maintains its share of total counterfeiting and piracy, it could account for $210 billion by 2015. Alternative projections based on internet traffic growth suggest this figure could reach **$240 billion by 2015.**

## Executive Summary

Together these estimates imply that the global value of counterfeit and pirated products could be up to **$1.77 trillion by 2015**.

## Analytical approach

In this report we have sought to build on the work of the OECD to provide up to date estimates of the impact of counterfeiting and piracy in the four categories identified in the OECD's work.  In some cases this has involved updating the OECD's analysis with more recent data, whereas in others it has involved developing new analysis, much of which is based on the OECD's analytical approach.  The analysis in relation to each of the four impact categories is based on a combination of publicly available data and assumptions.

The publicly available data is from reputable sources such as national governments and the OECD, and is supplemented where necessary with data and analysis from industry associations, businesses and academia.  We have based the assumptions used in the analysis on existing data and analysis where possible and have in all cases made the assumptions used as conservative as possible.  For instance, in projecting the value of counterfeiting and piracy to 2015, we have assumed growths rates considerably below those observed between 2005 and 2008.  The main body of the report sets out in detail the assumptions used in the analysis, the basis of those assumptions, and the impact that they have on our analysis.

It is important to note that the model does not include any multipliers, nor does it attempt to estimate the wider effects that counterfeiting may give rise to in terms of impact on the wider supply chain, investment by firms to prevent counterfeiting and piracy or potentially reduced investment and R&D incentives.

The analysis has been developed so that it can be used by national governments, independent agencies, industry sector associations or any other bodies seeking to identify and examine the costs and impacts of counterfeiting.  Over time, we hope that if this approach is implemented by policymakers and other stakeholders at a national level, the reliance on assumptions in developing estimates can be substantially reduced.

## Agenda for future research

Looking to the future research agenda, we believe that while it is important to have an understanding of global magnitudes in order to highlight the increasing threat to the global economy, more fine grained and detailed analysis is required on a country by country basis.

Only when the analysis is conducted on a country by country basis, can one identify in detail the negative impacts of counterfeiting and piracy, and the relative costs and benefits of significantly increasing enforcement activities.

Executive Summary

Moreover, analysis carried out at the country level is likely to provide better quality, more accurate estimates, due to greater and more robust data. To demonstrate the extent to which the types of approach identified in this report can be applied at a country level, Annexe 1 provides an illustrative assessment of the magnitude of counterfeiting and piracy in the US economy.

Finally, we believe an important next step in the work to identify the impact of counterfeiting and piracy will be to develop a robust methodology for understanding the relationship between the magnitude of counterfeiting and piracy and business losses.

Executive Summary

Exhibit 4

**14. CONVENTION ON THE SERVICE ABROAD OF
JUDICIAL AND EXTRAJUDICIAL DOCUMENTS
IN CIVIL OR COMMERCIAL MATTERS**

*(Concluded 15 November 1965)*

The States signatory to the present Convention,

Desiring to create appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time,

Desiring to improve the organisation of mutual judicial assistance for that purpose by simplifying and expediting the procedure,

Have resolved to conclude a Convention to this effect and have agreed upon the following provisions:

Article 1

The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad.

This Convention shall not apply where the address of the person to be served with the document is not known.

CHAPTER I – JUDICIAL DOCUMENTS

Article 2

Each Contracting State shall designate a Central Authority which will undertake to receive requests for service coming from other Contracting States and to proceed in conformity with the provisions of Articles 3 to 6.

Each State shall organise the Central Authority in conformity with its own law.

Article 3

The authority or judicial officer competent under the law of the State in which the documents originate shall forward to the Central Authority of the State addressed a request conforming to the model annexed to the present Convention, without any requirement of legalisation or other equivalent formality.

The document to be served or a copy thereof shall be annexed to the request. The request and the document shall both be furnished in duplicate.

Article 4

If the Central Authority considers that the request does not comply with the provisions of the present Convention it shall promptly inform the applicant and specify its objections to the request.

Article 5

The Central Authority of the State addressed shall itself serve the document or shall arrange to have it served by an appropriate agency, either –

*a)* by a method prescribed by its internal law for the service of documents in domestic actions upon persons who are within its territory, or

*b)* by a particular method requested by the applicant, unless such a method is incompatible with the law of the State addressed.

Subject to sub-paragraph *(b)* of the first paragraph of this Article, the document may always be served by delivery to an addressee who accepts it voluntarily.

If the document is to be served under the first paragraph above, the Central Authority may require the document to be written in, or translated into, the official language or one of the official languages of the State addressed.

That part of the request, in the form attached to the present Convention, which contains a summary of the document to be served, shall be served with the document.

Article 6

The Central Authority of the State addressed or any authority which it may have designated for that purpose, shall complete a certificate in the form of the model annexed to the present Convention.

The certificate shall state that the document has been served and shall include the method, the place and the date of service and the person to whom the document was delivered. If the document has not been served, the certificate shall set out the reasons which have prevented service.

The applicant may require that a certificate not completed by a Central Authority or by a judicial authority shall be countersigned by one of these authorities.

The certificate shall be forwarded directly to the applicant.

Article 7

The standard terms in the model annexed to the present Convention shall in all cases be written either in French or in English. They may also be written in the official language, or in one of the official languages, of the State in which the documents originate.

The corresponding blanks shall be completed either in the language of the State addressed or in French or in English.

Article 8

Each Contracting State shall be free to effect service of judicial documents upon persons abroad, without application of any compulsion, directly through its diplomatic or consular agents.

Any State may declare that it is opposed to such service within its territory, unless the document is to be served upon a national of the State in which the documents originate.

Article 9

Each Contracting State shall be free, in addition, to use consular channels to forward documents, for the purpose of service, to those authorities of another Contracting State which are designated by the latter for this purpose.

Each Contracting State may, if exceptional circumstances so require, use diplomatic channels for the same purpose.

Article 10

Provided the State of destination does not object, the present Convention shall not interfere with –

*a)*   the freedom to send judicial documents, by postal channels, directly to persons abroad,

*b)*   the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

*c)*   the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Article 11

The present Convention shall not prevent two or more Contracting States from agreeing to permit, for the purpose of service of judicial documents, channels of transmission other than those provided for in the preceding Articles and, in particular, direct communication between their respective authorities.


Article 12

The service of judicial documents coming from a Contracting State shall not give rise to any payment or reimbursement of taxes or costs for the services rendered by the State addressed.
The applicant shall pay or reimburse the costs occasioned by –--
a)     the employment of a judicial officer or of a person competent under the law of the State of destination,
b)     the use of a particular method of service.


Article 13

Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security.
It may not refuse to comply solely on the ground that, under its internal law, it claims exclusive jurisdiction over the subject-matter of the action or that its internal law would not permit the action upon which the application is based.
The Central Authority shall, in case of refusal, promptly inform the applicant and state the reasons for the refusal.


Article 14

Difficulties which may arise in connection with the transmission of judicial documents for service shall be settled through diplomatic channels.


Article 15

Where a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and the defendant has not appeared, judgment shall not be given until it is established that –
a)     the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory, or
b)     the document was actually delivered to the defendant or to his residence by another method provided for by this Convention,
        and that in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend.

Each Contracting State shall be free to declare that the judge, notwithstanding the provisions of the first paragraph of this Article, may give judgment even if no certificate of service or delivery has been received, if all the following conditions are fulfilled –
a)     the document was transmitted by one of the methods provided for in this Convention,
b)     a period of time of not less than six months, considered adequate by the judge in the particular case, has elapsed since the date of the transmission of the document,
c)     no certificate of any kind has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed.

Notwithstanding the provisions of the preceding paragraphs the judge may order, in case of urgency, any provisional or protective measures.


Article 16

When a writ of summons or an equivalent document had to be transmitted abroad for the purpose of service, under the provisions of the present Convention, and a judgment has been entered against a defendant who has not appeared, the judge shall have the power to relieve the defendant from the effects of the expiration of the time for appeal from the judgment if the following conditions are fulfilled –

*a)*     the defendant, without any fault on his part, did not have knowledge of the document in sufficient time to defend, or knowledge of the judgment in sufficient time to appeal, and

*b)*     the defendant has disclosed a *prima facie* defence to the action on the merits.

An application for relief may be filed only within a reasonable time after the defendant has knowledge of the judgment.

Each Contracting State may declare that the application will not be entertained if it is filed after the expiration of a time to be stated in the declaration, but which shall in no case be less than one year following the date of the judgment.

This Article shall not apply to judgments concerning status or capacity of persons.

CHAPTER II – EXTRAJUDICIAL DOCUMENTS

## Article 17

Extrajudicial documents emanating from authorities and judicial officers of a Contracting State may be transmitted for the purpose of service in another Contracting State by the methods and under the provisions of the present Convention.

CHAPTER III – GENERAL CLAUSES

## Article 18

Each Contracting State may designate other authorities in addition to the Central Authority and shall determine the extent of their competence.

The applicant shall, however, in all cases, have the right to address a request directly to the Central Authority.

Federal States shall be free to designate more than one Central Authority.

## Article 19

To the extent that the internal law of a Contracting State permits methods of transmission, other than those provided for in the preceding Articles, of documents coming from abroad, for service within its territory, the present Convention shall not affect such provisions.

## Article 20

The present Convention shall not prevent an agreement between any two or more Contracting States to dispense with –

*a)*     the necessity for duplicate copies of transmitted documents as required by the second paragraph of Article 3,

*b)*     the language requirements of the third paragraph of Article 5 and Article 7,

*c)*     the provisions of the fourth paragraph of Article 5,

*d)*     the provisions of the second paragraph of Article 12.

## Article 21

Each Contracting State shall, at the time of the deposit of its instrument of ratification or accession, or at a later date, inform the Ministry of Foreign Affairs of the Netherlands of the following –
a) the designation of authorities, pursuant to Articles 2 and 18,
b) the designation of the authority competent to complete the certificate pursuant to Article 6,
c) the designation of the authority competent to receive documents transmitted by consular channels, pursuant to Article 9.

Each Contracting State shall similarly inform the Ministry, where appropriate, of –
a) opposition to the use of methods of transmission pursuant to Articles 8 and 10,
b) declarations pursuant to the second paragraph of Article 15 and the third paragraph of Article 16,
c) all modifications of the above designations, oppositions and declarations.


## Article 22

Where Parties to the present Convention are also Parties to one or both of the Conventions on civil procedure signed at The Hague on 17th July 1905, and on 1st March 1954, this Convention shall replace as between them Articles 1 to 7 of the earlier Conventions.


## Article 23

The present Convention shall not affect the application of Article 23 of the Convention on civil procedure signed at The Hague on 17th July 1905, or of Article 24 of the Convention on civil procedure signed at The Hague on 1st March 1954.
These Articles shall, however, apply only if methods of communication, identical to those provided for in these Conventions, are used.


## Article 24

Supplementary agreements between Parties to the Conventions of 1905 and 1954 shall be considered as equally applicable to the present Convention, unless the Parties have otherwise agreed.


## Article 25

Without prejudice to the provisions of Articles 22 and 24, the present Convention shall not derogate from Conventions containing provisions on the matters governed by this Convention to which the Contracting States are, or shall become, Parties.


## Article 26

The present Convention shall be open for signature by the States represented at the Tenth Session of the Hague Conference on Private International Law.
It shall be ratified, and the instruments of ratification shall be deposited with the Ministry of Foreign Affairs of the Netherlands.


## Article 27

The present Convention shall enter into force on the sixtieth day after the deposit of the third instrument of ratification referred to in the second paragraph of Article 26.
The Convention shall enter into force for each signatory State which ratifies subsequently on the sixtieth day after the deposit of its instrument of ratification.

Article 28

Any State not represented at the Tenth Session of the Hague Conference on Private International Law may accede to the present Convention after it has entered into force in accordance with the first paragraph of Article 27. The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Netherlands.
The Convention shall enter into force for such a State in the absence of any objection from a State, which has ratified the Convention before such deposit, notified to the Ministry of Foreign Affairs of the Netherlands within a period of six months after the date on which the said Ministry has notified it of such accession.
In the absence of any such objection, the Convention shall enter into force for the acceding State on the first day of the month following the expiration of the last of the periods referred to in the preceding paragraph.

Article 29

Any State may, at the time of signature, ratification or accession, declare that the present Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect on the date of entry into force of the Convention for the State concerned.
At any time thereafter, such extensions shall be notified to the Ministry of Foreign Affairs of the Netherlands.
The Convention shall enter into force for the territories mentioned in such an extension on the sixtieth day after the notification referred to in the preceding paragraph.

Article 30

The present Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 27, even for States which have ratified it or acceded to it subsequently.
If there has been no denunciation, it shall be renewed tacitly every five years.
Any denunciation shall be notified to the Ministry of Foreign Affairs of the Netherlands at least six months before the end of the five year period.
It may be limited to certain of the territories to which the Convention applies.
The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 31

The Ministry of Foreign Affairs of the Netherlands shall give notice to the States referred to in Article 26, and to the States which have acceded in accordance with Article 28, of the following –
a)    the signatures and ratifications referred to in Article 26;
b)    the date on which the present Convention enters into force in accordance with the first paragraph of Article 27;
c)    the accessions referred to in Article 28 and the dates on which they take effect;
d)    the extensions referred to in Article 29 and the dates on which they take effect;
e)    the designations, oppositions and declarations referred to in Article 21;
f)    the denunciations referred to in the third paragraph of Article 30.


In witness whereof the undersigned, being duly authorised thereto, have signed the present Convention.

Done at The Hague, on the 15th day of November, 1965, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Netherlands, and of which a certified copy shall be sent, through the diplomatic

channel, to each of the States represented at the Tenth Session of the Hague Conference on Private International Law.

# Status table

## 01: Statute of the Hague Conference on Private International Law

Entry into force: 15-VII-1955

Last update: 14-X-2010

print **View and/or print full status report**

1) S = Signature
2) R/A/Su = Ratification, Accession or Succession
3) Type = R: Ratification;
A: Accession;
A*: Accession giving rise to an acceptance procedure; click on A* for details of acceptances of the accession;
C: Continuation;
Su: Succession;
Den: Denunciation;
4) EIF = Entry into force
5) Ext = Extensions of application
6) Auth = Designation of Authorities
7) Res/D/N = Reservations, declarations or notifications

## Members of the Organisation

| States | S[1] | R/A/Su[2] | Type[3] | EIF[4] | Ext[5] | Auth[6] | Res/D/N[7] |
|---|---|---|---|---|---|---|---|
| Albania | 4-VI-2002 | | | 4-VI-2002 | | 1 | |
| Argentina | 28-IV-1972 | | | 28-IV-1972 | | 1 | |
| Australia | 1-XI-1973 | | | 1-XI-1973 | | 1 | |
| Austria | 16-IX-1954 | | | 15-VII-1955 | | 1 | |
| Belarus | 12-VII-2001 | | | 12-VII-2001 | | 1 | |
| Belgium | 1-IX-1953 | | | 15-VII-1955 | | 1 | |
| Bosnia and Herzegovina | 1-VIII-2001 | | | 7-VI-2001 | | 1 | |
| Brazil | 23-II-2001 | | | 23-II-2001 | | 1 | |
| Bulgaria | 22-IV-1999 | | | 22-IV-1999 | | 1 | |
| Canada | 7-X-1968 | | | 7-X-1968 | | 1 | |
| Chile | 25-IV-1986 | | | 25-IV-1986 | | 1 | |
| China, People's Republic of | 3-VII-1987 | | | 3-VII-1987 | | 1 | D |
| Croatia | 1-X-1995 | | | 12-VI-1995 | | 1 | |
| Cyprus | 8-X-1984 | | | 8-X-1984 | | 1 | |

| | | | | | |
|---|---|---|---|---|---|
| Czech Republic | 1-IV-1993 | | 28-I-1993 | 1 | |
| Denmark | 26-II-1954 | | 15-VII-1955 | 1 | |
| Ecuador | 2-XI-2007 | | 2-XI-2007 | 1 | |
| Egypt | 24-IV-1961 | | 24-IV-1961 | 1 | |
| Estonia | 13-V-1998 | | 13-V-1998 | 1 | |
| European Union | 3-IV-2007 | | 3-IV-2007 | 1 | D,N 3 |
| Finland | 2-XII-1955 | | 2-XII-1955 | 1 | |
| France | 20-IV-1964 | | 20-IV-1964 | 1 | |
| Georgia | 28-V-2001 | | 28-V-2001 | 1 | |
| Germany | 14-XII-1955 | | 14-XII-1955 | 1 | |
| Greece | 26-VIII-1955 | | 26-VIII-1955 | 1 | |
| Hungary | 6-I-1987 | | 6-I-1987 | 1 | |
| Iceland | 14-XI-2003 | | 14-XI-2003 | 1 | |
| India | 13-III-2008 | | 13-III-2008 | 1 | |
| Ireland | 26-VIII-1955 | | 26-VIII-1955 | 1 | |
| Israel | 24-IX-1964 | | 24-IX-1964 | 1 | |
| Italy | 26-VI-1957 | | 26-VI-1957 | 1 | |
| Japan | 27-VI-1957 | | 27-VI-1957 | 1 | |
| Jordan | 13-VI-2001 | | 13-VI-2001 | 1 | |
| Korea, Republic of | 20-VIII-1997 | | 20-VIII-1997 | 1 | |
| Latvia | 11-VIII-1992 | | 11-VIII-1992 | 1 | |
| Lithuania | 23-X-2001 | | 23-X-2001 | 1 | |
| Luxembourg | 12-III-1956 | | 12-III-1956 | 1 | |
| Malaysia | 2-X-2002 | | 2-X-2002 | 1 | |
| Malta | 30-I-1995 | | 30-I-1995 | 1 | |
| Mexico | 18-III-1986 | | 18-III-1986 | 1 | |
| Monaco | 8-VIII-1996 | | 8-VIII-1996 | 1 | |
| Montenegro | 15-V-2007 | | 1-III-2007 | 1 | |
| Morocco | 6-IX-1993 | | 6-IX-1993 | 1 | |
| Netherlands | 25-IX-1954 | | 15-VII-1955 | 1 | N |
| New Zealand | 5-II-2002 | | 5-II-2002 | 1 | D |
| Norway | 15-VII-1955 | | 15-VII-1955 | 1 | |
| Panama | 29-V-2002 | | 29-V-2002 | 1 | |
| Paraguay | 28-VI-2005 | | 28-VI-2005 | 1 | |
| Peru | 29-I-2001 | | 29-I-2001 | 1 | |
| Philippines | 14-VII-2010 | | 14-VII-2010 | 1 | |
| Poland | 29-V-1984 | | 29-V-1984 | 1 | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Portugal | 8-XII-1953 | | | 15-VII-1955 | 1 | D - |
| Romania | 10-IV-1991 | | | 10-IV-1991 | 1 | |
| Russian Federation | 6-XII-2001 | | | 6-XII-2001 | 1 | |
| Serbia | 1-VI-2001 | | | 26-IV-2001 | 1 | |
| Slovakia | 1-VI-1993 | | | 26-IV-1993 | 1 | |
| Slovenia | 15-XI-1992 | | | 18-VI-1992 | 1 | |
| South Africa | 14-II-2002 | | | 14-II-2002 | 1 | |
| Spain | 8-XII-1953 | | | 15-VII-1955 | 1 | |
| Sri Lanka | 27-IX-2001 | | | 27-IX-2001 | 1 | |
| Suriname | 7-X-1977 | | | 7-X-1977 | 1 | |
| Sweden | 9-XII-1953 | | | 15-VII-1955 | 1 | |
| Switzerland | 6-V-1957 | | | 6-V-1957 | 1 | |
| The former Yugoslav Republic of Macedonia | 1-XII-1993 | | | 20-IX-1993 | 1 | |
| Turkey | 26-VIII-1955 | | | 26-VIII-1955 | 1 | |
| Ukraine | 3-XII-2003 | | | 3-XII-2003 | 1 | |
| United Kingdom of Great Britain and Northern Ireland | 3-I-1955 | | | 15-VII-1955 | 1 | |
| United States of America | 15-X-1964 | | | 15-X-1964 | 1 | |
| Uruguay | 27-VII-1983 | | | 27-VII-1983 | 1 | |
| Venezuela | 25-VII-1979 | | | 25-VII-1979 | 1 | |

1) S = Signature
2) R/A/Su = Ratification, Accession or Succession
3) Type = R: Ratification;
A: Accession;
A*: Accession giving rise to an acceptance procedure; click on A* for details of acceptances of the accession;
C: Continuation;
Su: Succession;
Den: Denunciation;
4) EIF = Entry into force
5) Ext = Extensions of application
6) Auth = Designation of Authorities
7) Res/D/N = Reservations, declarations or notifications

Exhibit 5

THE SUPREME PEOPLE'S COURT OF THE PEOPLE'S REPUBLIC OF CHINA

**PRC Laws**                     Posted: 2003-06-03 14:55:53

- ▾ **Judicial News**
- ▾ **Grand Justices**
- ▾ **Judicial System**
- ▾ **Laws&Regulations**
- ▾ **PRC Laws**
- ▾ **Focus News**
- ▾ **Home**

# CIVIL PROCEDURE LAW OF THE PEOPLE'S REPUBLIC OF CHINA

**(Adopted on April 9, 1991)**

CONTENTS

PART ONE GENERAL PROVISIONS

CHAPTER I THE AIM, SCOPE OF APPLICATION AND BASIC PRINCIPLES

CHAPTER II JURISDICTION

SECTION 1 JURISDICTION BY LEVEL

SECTION 2 TERRITORIAL JURISDICTION

SECTION 3 REFERRAL AND DESIGNATION OF JURISDICTION

CHAPTER III TRIAL ORGANIZATION

CHAPTER IV WITHDRAWAL

CHAPTER V PARTICIPANTS IN PROCEEDINGS

SECTION 1 PARTIES

SECTION 2 AGENTS AD LITEM

CHAPTER VI EVIDENCE

CHAPTER VII TIME PERIODS AND SERVICE

SECTION 1 TIME PERIODS

SECTION 2 SERVICE

CHAPTER VIII CONCILIATION

CHAPTER IX PROPERTY PRESERVATION AND PRELIMINARY EXECUTION

CHAPTER X COMPULSORY MEASURES AGAINST IMPAIRMENT OF CIVIL ACTIONS

CHAPTER XI LITIGATION COSTS

PART TWO TRIAL PROCEDURE

CHAPTER XII ORDINARY PROCEDURE OF FIRST INSTANCE

SECTION 1 BRINGING A SUIT AND ACCEPTING A CASE

SECTION 2 PREPARATIONS FOR TRIAL

SECTION 3 TRIAL IN COURT

SECTION 4 SUSPENSION AND CONCLUSION OF A LAWSUIT

SECTION 5 JUDGMENT AND ORDER

CHAPTER XIII SUMMARY PROCEDURE

CHAPTER XIV PROCEDURE OF SECOND INSTANCE

CHAPTER XV SPECIAL PROCEDURE

SECTION 1 GENERAL STIPULATIONS

SECTION 2 CASES CONCERNING CREDENTIALS OF VOTERS

SECTION 3 CASES CONCERNING THE PROCLAMATION OF A PERSON AS MISSING OR DEAD

SECTION 4 CASES CONCERNING THE DETERMINATION OF A CITIZEN AS INCOMPETENT OR WITH LIMITED CAPACITY FOR CIVIL CONDUCT

SECTION 5 CASES CONCERNING THE DETERMINATION OF A PROPERTY AS OWNERLESS

CHAPTER XVI PROCEDURE FOR TRIAL SUPERVISION

CHAPTER XVII SUMMARY PROCEDURE FOR RECOVERING A DEBT

CHAPTER XVIII PROCEDURE FOR PUBLIC INVITATION TO ASSERT CLAIMS

CHAPTER XIX PROCEDURE FOR THE BANKRUPTCY REPAYMENT OF ENTERPRISES AS LEGAL PERSONS

PART THREE PROCEDURE OF EXECUTION

CHAPTER XX GENERAL STIPULATIONS

CHAPTER XXI APPLICATION FOR AND REFERRAL OF EXECUTION

CHAPTER XXII EXECUTION MEASURES

CHAPTER XXIII SUSPENSION AND CONCLUSION OF EXECUTION

PART FOUR SPECIAL STIPULATIONS FOR CIVIL PROCEDURES INVOLVING FOREIGN INTERESTS

CHAPTER XXIV GENERAL PRINCIPLES

CHAPTER XXV JURISDICTION

CHAPTER XXVI SERVICE AND TIME PERIODS

CHAPTER XXVII PROPERTY PRESERVATION

CHAPTER XXVIII ARBITRATION

CHAPTER XXIX JUDICIAL ASSISTANCE

PART ONE GENERAL PROVISIONS

CHAPTER I THE AIM, SCOPE OF REGULATION AND BASIS PRINCIPLES

Article 1. The Civil Procedure Law of the People's Republic of China is formulated on the basis of the Constitution and in the light of the experience and actual conditions of our country in trying civil cases.

M

SECTION 1 TIME PERIODS

Article 75. Time periods shall include those prescribed by law and those designated by a people's court.

Time periods shall be calculated by the hour, the day, the month and the year. The hour and day from which a time period begins shall not be counted as within the time period.

If the expiration date of a time period falls on a holiday, then the day immediately following the holiday shall be regarded as the expiration date.

A time period shall not include traveling time. A litigation document that is mailed before a deadline shall not be regarded as overdue.

Article 76. If a party fails to meet a deadline due to force majeure or for other justified reasons, he may apply for an extension of the time limit within 10 days after the obstacle is removed. The requested extension shall be subject to approval by a people's court.

SECTION 2 SERVICE

Article 77. A receipt shall be required for every litigation document that is served and it shall bear the signature or seal of the recipient of the service and the date of receipt.

The date of receipt as signed by the recipient of the service shall be regarded as the date the document is served.

Article 78. Litigation documents shall be served directly on the recipient of the service. If the recipient of the service is a citizen, the documents shall, in the case of his absence, be receipted by an adult member of his family living with him. If the recipient of the service is a legal person or any other organization, the document shall be receipted by the legal representatives of the legal person or the principle leading personnel of any other organization or the personnel of the legal person or any other organization in charge of receiving such documents; If the recipient of the service has an agent ad litem, the documents may be receipted by the agent ad litem. If the recipient of the service has designated an agent to receive his litigation documents and has informed the people's court of it, the documents may be receipted by the agent.

The date of receipt as signed by the adult family member living with the recipient of service, or persons in charge of receiving documents of legal persons or other organizations, or agents ad litem, or agents designated to receive his documents shall be regarded as the date the document is served.

Article 79. If the recipient of the service of a litigation document or the adult family member living with him refuses to accept a legal document, the person serving the document shall ask representatives from the relevant grassroots organization or the unit to which the recipient of the service belongs to appear on the scene, explain the situation to them, and record on the receipt the particulars of the refusal and the date of it. After the person serving the document and the witnesses have affixed their signatures or seals to the receipt, the document shall be left at the place where recipient of the service stays and the service shall be considered completed.

Article 80. If direct service of a litigation document proves difficult, service of the document may be entrusted to another people's court, or it may be served by post. If a document is served by post, the date as stated on the receipt shall be regarded as the date the document is served.

Article 81. If the recipient of the service is in the military, the document shall be forwarded to him by the political organ at or above the regimental level in the unit to which he belongs.

M

Article 82. If the recipient of the service is undergoing imprisonment, the document shall be forwarded to him by the prison or unit of reform through labour where he is serving his term.

If the recipient of the service is undergoing rehabilitation through labour, the document shall be forwarded to him by the unit supervising his rehabilitation through labour.

Article 83. Any organization or unit that receives a litigation document to be forwarded must immediately deliver it to the recipient of the service for a receipt. The date as stated on the receipt shall be regarded as the date the document is served.

Article 84. If the whereabouts of a recipient of the service is unknown, or if a document cannot be served by the other methods mentioned in this section, the document shall be served by public announcement. Sixty days after the date of the public announcement, the document shall be deemed to have been served.

The reasons for service by public announcement and the procedures taken shall be recorded in the case files.

CHAPTER VIII CONCILIATION

Article 85. In handling civil cases, the people's court shall distinguish between right and wrong and conduct conciliation on the basis of the principle of voluntariness of the parties and evident facts.

Article 86. When a people's court conducts a conciliation, a single judge or a collegial panel may preside. Conciliations shall be conducted locally whenever possible.

When a people's court conducts a conciliation, it may employ simplified methods to notify the parties and witnesses to appear in court.

Article 87. When a people's court conducts a conciliation, it may request the assistance of units or individuals concerned. The requested units or individuals shall assist the people's court in conducting the conciliation.

Article 88. A conciliation agreement must be based on voluntariness of both parties, and shall not be reached through compulsion. The content of the conciliation agreement may not contravene the law.

Article 89. When a conciliation agreement is reached, the people's court shall draw up a conciliation statement. A conciliation statement shall clearly set forth the claims of the action, the facts about the case, and the result of the conciliation.

The conciliation statement shall be signed by the judge and the court clerk, sealed by the people's court, and served on both parties.

Once the conciliation statement is receipted and signed by both parties, it shall become legally effective.

Article 90. The people's court need not draw up a conciliation statement for the following cases when an agreement is reached through conciliation:

(1) cases of divorce in which both parties have become reconciled after conciliation;

(2) cases in which adoptive relationship has been maintained through conciliation;

(3) cases in which the claims can be immediately satisfied; and

(4) other cases that do not require conciliation statements.

Any agreement that does not require a conciliation statement shall be entered into